UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE No.:25-CV-81490

BRIDGET QUINN

      Plaintiff,

vs.

TRANSOCEANIC CABLE SHIP
COMPANY, LLC nka SUBCOM LLC

      Defendant(s).

_____/

## **COMPLAINT AND DEMAND FOR JURY TRIAL**

COMES NOW, Plaintiff BRIDGET QUINN, by and through the undersigned attorneys, and files this Complaint against Defendant TRANSOCEANIC CABLE SHIP COMPANY, LLC nka SUBCOM LLC, and states:

### **SUMMARY OF THE CASE**

Plaintiff Bridget Quinn is a former deep-sea merchant mariner and naval reservist who worked for SubCom for six years. After her employment with Defendant SubCom terminated, SubCom made false and malicious statements about Plaintiff to the Defense Counterintelligence and Security Agency (DCSA) in response to background-check forms sent as part of her application for federal employment. The statements accused Quinn of dishonesty, questionable ethics, and falsification of information concerning the identity of her supervisor, and stated she was not eligible for rehire. The defamatory statements made by SubCom were false, malicious, and intended to undermine her career, including her ability to obtain and maintain a national-security clearance. Plaintiff brings claims for defamation per se, defamation by implication, and

1

trade libel, and seeks compensatory and punitive damages, as well as a breach of contract claim against SubCom.

## PARTIES

1.      Plaintiff BRIDGET QUINN ("Captain Quinn," "Quinn" or "Plaintiff"), is  a citizen of the State of Pennsylvania.

2.      Defendant TRANSOCEANIC CABLE SHIP COMPANY, LLC nka SUBCOM LLC ("SubCom" or "Defendant"), is a limited liability company, formed under the laws of New Jersey, with its principal place of business in Baltimore, MD. SubCom is registered to conduct business in Florida as a foreign limited liability company and regularly conducts business in Florida, including but not limited to maintaining significant business connections and dealings with the American Maritime Officers ("AMO") Union in Dania Beach, Broward County, Florida. It is believed Subcom's sole member is David Coughlan, who is a citizen of the State of Massachusetts.

## JURISDICTION &VENUE

3.      This Court has original jurisdiction over this action under 28 USCS § 1332, because there is complete diversity of citizenship between the plaintiff, a citizen of Pennsylvania, and the Defendant is a citizen of New Jersey, operating in Broward County, Florida.

4.      The amount in controversy exceeds $75,000, exclusive of interest and costs, satisfying the requirements for diversity jurisdiction.

5.       The Court has personal jurisdiction over Defendant because Defendant conducts substantial and ongoing business activities in Florida, including maintaining significant operational and labor-management relationships with the American Maritime Officers ("AMO") Union in Broward County. These Florida-based relationships are integral to SubCom's hiring,

training, credentialing, and supervision of officers such as Plaintiff. Defendant purposefully availed itself of the privilege of conducting business in Florida, and the claims in this action arise directly from that Florida-centered business relationship.

6.      Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this action occurred in this District. The defamatory DCSA statements were received, reviewed, and acted upon within Plaintiff's professional organization, the AMO Union located in Broward County, Florida, where the resulting reputational and economic harm to Plaintiff occurred.

**The Parties have Significant Ties to Florida**

7.      As a condition of her employment by and with SubCom, Plaintiff Quinn was required to join the AMO Union, so that they could outsource Quinn's professional development to the Union, and outsource other aspects of Plaintiff's employment.

8.      SubCom and the AMO Union have an extremely close business and working relationship.  SubCom's Director of Fleet Operations and Labor, Scott Winfield, is a member of the board of directors of the AMO Union in Dania Beach, Florida, and frequently attends the AMO meetings as part of his duties.

9.      Quinn joined the AMO Union either contemporaneously with, or shortly after beginning work with SubCom to satisfy that requirement.

10.      As a large part of the professional development offered by the Union and required by SubCom, Plaintiff would often visit Florida to attend the training school offered by the AMO Union.

11.      The AMO Union offers both mandatory and optional trainings at its headquarters in Florida.

12.     Plaintiff reported to Florida multiple times for required maritime training that SubCom directed, authorized, or conditioned her continued employment upon, including:

a.   At SubCom's request, Plaintiff reported to the AMO Training School in Florida for mandatory Military Sealift Command training, consisting of three required courses completed during a single visit;

b.   Plaintiff reported to Florida on two separate occasions to complete Basic Safety and Firefighting training, which is required to maintain her Merchant Mariner Credential. A valid credential is a condition of employment for SubCom officers, and SubCom required it to remain current in order for Plaintiff to sail;

c.   Plaintiff reported to Florida to complete a Ship Handling for Third Mates course, which advanced her licensure toward Second Mate and enabled her to qualify for higher-ranked duties sooner, thereby benefiting SubCom's operational needs;

d.   When an officer sailing for SubCom elected to attend maritime training at a school other than the AMO Training School, SubCom would not pay for that training if AMO offered an equivalent course. This practice reinforced that SubCom required and expected its officers to obtain their professional development and credentialing through the AMO facilities located in Florida.

13.     Captain Quinn also reported to the AMO Union in Florida for training to become eligible for promotions – for example promotions from Second Mate, to First Officer, Chief Mate and so on. It was understood by the SubCom personnel that they were expected to obtain higher licensing for the needs of the company. Additionally, SubCom financially incentivized its personnel to attend said trainings, at the AMO Union in Florida, to ensure the benefits of having higher licensed personnel on SubCom vessels at all times.

14.     Defendant SubCom was and is aware that Plaintiff Quinn also holds a very important business relationship with the AMO Union, as this is the organization which has managed Plaintiff's professional development since her membership with the Union in 2017.

15.     The AMO Union offers career assistance for its members both during and after their tenure with SubCom.  Their "manning pool" is located in Dania Beach, Florida. The AMO Union will often assist a seaman in gaining additional credentials needed to obtain a different or higher level role.

16.     Venue is proper under 28 U.S.C. § 1391(b)(2) because the defamatory statements caused concrete and immediate harm in this District. The AMO Union in Dania Beach received the DCSA Forms, discussed them with Plaintiff, and relied on them in ways that damaged her reputation, disrupted her union standing, and interfered with her ability to obtain career placement and training in Florida. The tort was therefore felt, and its consequences realized, within this District.   Moreover, the defamatory statements are automatically accessed and re-published each time Plaintiff undergoes a security-clearance review or applies for any position requiring a clearance, because the DCSA's Personnel Vetting Records System re-disseminates SubCom's false statements to federal agencies and cleared contractor companies as part of every adjudication and hiring inquiry.

17.     Once the defamatory statements were received in Florida by the AMO Union, Captain Quinn immediately suffered reputational harm within the Union. This reputational damage directly impaired her ability to access core Union benefits, including career placement assistance, required training opportunities, and support for disputes that must be processed through the Union and SubCom. The AMO Union's treatment of Quinn changed as a direct result of SubCom's false statements, and her ability to function as a Union member has been materially damaged.

## GENERAL ALLEGATIONS

**I.**     **Captain Quinn's Credentials and Vast Experience in the Maritime and Naval Industries.**

18.     Captain Quinn is a highly qualified deep-sea ship captain with extensive training and expertise in maritime operations.

19.     From 2013 to 2017, Quinn attended the United States Merchant Marine Academy, a federal services academy in Kings Point, New York, providing undergraduate education and training for commissioned officers in the U.S. Armed Forces.

20.     As a student, Quinn received a prestigious internship with the United States Coast Guard, Ship Superintendent, tasked with, among other things, inspections of passenger rescue boats, ensuring their watertight integrity.

21.     Quinn has held a national security clearance with the Department of Defense [1] since February 2014, typical for graduates of the U.S. Marine Academy.

22.     As a student, Quinn also received the U.S. Merchant Marine Expeditionary Award, and served as the Regimental Human Relations Officer for the United States Merchant Marine Academy, from 2016 to 2017.

23.     In 2017, Quinn obtained her Bachelor's of Science degree from the Marine Academy, in "Maritime Logistics & Security."

24.     Quinn has served in the U.S. Naval Reserve since June 2017.

25.     Quinn is a Lieutenant (O-3), Commissioned Naval Officer serving as a Strategic Sealift Officer (SSO).

---

[1] References in this Complaint to the Department of Defense reflect the terminology used in the DCSA investigative forms. The agencies identified in the forms continue to operate under their current statutory names. Any description of agency names in this pleading is consistent with the terminology used in the documents at issue.

26.     Quinn is also qualified to serve as a Tactical Advisor (TACAD) and in the capacity of a Naval Cooperation and Guidance for Shipping (NCAGS) advisor in times of peace and war.

27.     In these reservist roles, Quinn is qualified to provide critical maritime and logistic support during U.S. national defense emergencies.

28.     Quinn is a Certified Rescue SCUBA Diver since October of 2025.

29.     Quinn holds a US Coast Guard Masters License, Unlimited Tonnage, Upon Oceans, meaning she is qualified to command vessels of any size and gross tonnage, including those for international voyages. This highest level of license allows command of large merchant ships, cargo vessels, and inspected passenger vessels like ferries and cruise ships, as well as uninspected vessels, with no tonnage or geographic limitations.

30.     Captain Quinn is credentialed as "Tankerman PIC (Person in Charge) for Dangerous Liquids," a qualification required to legally supervise the transfer of dangerous liquids on a tank vessel.

31.     Quinn is also certified as a Dynamic Positioning Operator, Offshore Unlimited, a credential reflecting extensive DP sea time and advanced training required to operate a vessel's dynamic positioning system during offshore operations.

**II.     SubCom Hires Captain Quinn in October 2017.**

32.     On October 10, 2017, Captain Quinn was hired by SubCom, originally in the role of Third Mate, to work as a ship captain onboard a SubCom vessel, the "Resolute."

33.     Quinn's longstanding national security clearance, held since 2014, was one of the primary reasons SubCom hired her. SubCom routinely hires U.S. Merchant Marine Academy graduates because they already possess security clearances needed for sensitive commercial and government work.

34.     SubCom designs, manufactures, and deploys cable networks for global high-speed data transmission.

35.     SubCom uses merchant ships as platforms for its global fiber-optic cable work and employs deep-sea merchant mariners in accordance with minimum manning requirements.

36.     Captain Quinn worked for SubCom for six (6) years, until 2023, advancing in both position and salary during that time, as explained more thoroughly below.

37.     Captain Quinn was promoted three (3) times, and served on at least four (4) different SubCom vessels during her tenure - the Resolute, the Durable, the Dependable, and the Endeavour.

38.     Deep sea merchant mariners, like Quinn, will typically work onboard for approximately 75-120 days, and return ashore  for a rotational vacation, with a prescribed contractual return to work date, and so on.  Captain Quinn was on such a rotation, with varied lengths onboard and off.

39.     Quinn began as a Third Mate, but was promoted to Second Mate, in April 2019, after just five (5) rotations with SubCom onboard the Resolute and Durable vessels.

40.     In these roles, Quinn served as a navigator, planned voyages, and manned key navigational and radio equipment.

41.     As part of Captain Quinn's duties, she was also responsible for inspecting and maintaining all lifesaving and firefighting equipment on board, as well as supervising safety of deck operations including SubCom deep sea cable repairs, mooring, anchoring, and ensuring the safety of all crew and proper use of involved equipment and operational readiness.

42.     In September 2019, just five (5) months after her prior promotion to Second Mate (equivalent to two (2) more onboard rotations), Quinn was then promoted to First Officer of the Dependable.

43.     Quinn was promoted to First Officer by non-party "Captain Porter," with approval from SubCom's personnel office.

44.     Quinn's performance as First Officer was strong, and she consistently met or exceeded SubCom's operational and navigational standards, as reflected in her expanded duties and continued promotions.

45.     Quinn was placed as the Senior Deck Officer in charge of a navigational, dynamic positioning, and cable nightshift on installation and repair of multimillion-dollar subsea fiber optic cable systems, ensuring safety of the Ships during SubCom's submarine cable operations.

46.     Quinn was further accountable for vessel administration, document control, immigration documentation, payroll, and cable equipment records and expenditures.

47.     Quinn excelled in her duties throughout her tenure with SubCom.

### III.     **Quinn's Parents Visit Her During a Long Onboard Rotation; the Visit is Uneventful.**

48.     On May 30, 2020, Captain Quinn was granted authority by her superior, non-party Captain Yann Durieux ("Captain Durieux") to take a small passenger rescue boat off the Dependable ship.

49.     Quinn's parents were visiting her in the vicinity of the Chesapeake and Delaware Canal and her parents were authorized by Captain Durieux to embark the vessel's rescue boat for a short ride.

50.     The rescue boat operation was routine practice; ship members are required to operate and test the rescue boats periodically to ensure functionality, and the Dependable was underway in waters the Captain had deemed safe for such testing.

51.     Rescue boats are typically operated by the First Officer or Second Mate. Quinn had years of experience operating these vessels and held a credential in "proficiency in fast rescue boats," which exceeds the requirements applicable to the Reliance Class rescue boats at the time of the event.

52.     Non-party Captain Amiscosa, a First Officer, was in the rescue boat at the time along with Quinn, a Second Mate at that time, and Quinn's parents.

53.     The rescue boat ride was brief and uneventful.

54.     For the three (3) months that followed the rescue boat ride, Quinn continued on her four (4) month rotation onboard the Dependable vessel.

55.     Quinn continued her rotation without incident after the rescue boat event and was shortly thereafter assigned elevated responsibilities consistent with her performance.

56.     She was promoted again in July 2020. Although Quinn had begun that particular onboard rotation as a Second Mate, due to staffing needs, she was again promoted to First Officer for one week in July 2020 to allow Captain Amiscosa to take a brief leave from the vessel.

57.     Also in July 2020, SubCom requested that Captain Quinn obtain an additional higher security clearance, for a particular confidential contract the company was undertaking.

58.     Scott Winfield, SubCom's Director of Fleet Operations and Labor and a member of the AMO Union's Board of Directors, both recommended and coordinated the higher-level security clearance process for Quinn.

59. As part of the stringent vetting process for the higher national security clearance, Quinn passed a polygraph test, among other investigatory processes.

60. Quinn was successfully issued the higher security clearance in July 2020.

61. SubCom regularly requires personnel to obtain higher-level clearances, and hiring officers who already possess a secret national security clearance facilitates this higher level process.

IV. **SubCom Manufactures an Alleged Instance of "Misconduct" Three Months After the Uneventful Visit by Quinn's Parents.**

62. Despite Quinn's continued strong performance, SubCom disciplined her in August 2020. This was now almost three (3) months after the uneventful rescue-boat ride, and one (1) month after her promotion to First Officer, and her receipt of an enhanced national security clearance for SubCom's benefit, to enable it to service an important and confidential government client.

63. Captain Durieux, who authorized the rescue boat ride, received only minimal discipline.

64. SubCom demanded that Quinn accept a six-month suspension without pay, as the penalty for the alleged infraction, and instructed her not to disclose the penalty to the AMO Union which ordinarily negotiates such matters on behalf of its members.

65. SubCom insisted the penalty remain confidential, and this requirement is reflected in the Disciplinary Warning Agreement Quinn was required to sign on August 21, 2020. SubCom also made clear that her employment was at risk and threatened termination if she did not agree to the confidential disciplinary action. **See Exhibit A, August 2020 Disciplinary Warning.** Exhibit A is being attached separately and filed under seal.

66.     Captain Quinn hesitated, not only because the AMO Union should have had the opportunity to weigh in on the agreement, but also because the structure of the agreement was particularly unfair - as this was not a typical "suspension without pay" penalty.

67.     Reason being that, in the deep-sea merchant mariner industry, compensation is earned in two parts: onboard pay and the affiliated vacation pay that is released only after completing a rotation. A portion of officers' pay is withheld and released only when they rotate ashore for "vacation."

68.     The six month penalty SubCom imposed consisted of removing Quinn from her next scheduled onboard rotation. Therefore, by forcing Quinn to miss an entire onboard rotation, SubCom deprived her of both the onboard pay she would have earned and the affiliated vacation pay.  SubCom's punishment deprived her of the entire next cycle of compensation.

69.     On or about August 17, 2020, SubCom issued its "official" written Disciplinary Warning to Quinn.

70.     SubCom's written Disciplinary Warning identifies no actual health issues or injuries that resulted from the May 30, 2020 rescue boat ride. See **Exhibit A.**

71.     After SubCom provided the written agreement to Quinn, it pressured her to sign it on multiple occasions.

72.     Scott Winfield, Director of Fleet Operations and Labor, called Quinn directly and told her "we just need to sign this and we'll all be better for it." Other SubCom staff also reached out to pressure her into signing.

73.     Quinn ultimately signed the Disciplinary Warning, agreeing to a six-month suspension without pay. SubCom represented that the disciplinary matter would remain confidential and repeatedly referred to the document as an "NDA." See **Exhibit A.**

## V.   <u>Captain Durieux Accepts Complete Responsibility for the Event, in a Written Statement to SubCom.</u>

74.     Before SubCom issued the Disciplinary Warning, Captain Durieux submitted a written statement on August 15, 2020 accepting full responsibility for authorizing Quinn's parents to ride in the rescue boat. Typically, any errors that occur on a vessel are indeed the captain's fault, and in this case, the fault should have resided with Captain Durieux.

75.     Since the COVID precautions on the rescue boat were SubCom's main concern, Durieux explained to SubCom that face masks were worn by all parties on the rescue boat, distance was maintained per COVID requirements, and that Captain Quinn's parents had been self-quarantining prior to the boat ride, as recommended by the CDC.

76.     At the time of the rescue boat ride, on May 30, 2020, Quinn had been onboard the Dependable continuously for two and half (2 ½) months. Captain Durieux advised SubCom in writing that HE made the decision to allow Quinn to see her family because she was in the middle of a long, four (4) month, onboard rotation.

77.     Durieux further explained that he had previously allowed other officers' family members to participate in similar rides, and would have permitted the same for any other crew member, including male officers who were allowed the same sort of activity in the past.

78.     Allowing non-screened individuals or non-employees aboard SubCom vessels was a fairly common practice.

79.     For example, directly following the event with Quinn's parents, while the Dependable vessel was in port in during a port stay in Newington, New Hampshire, other non-screened individuals were allowed to board the vessel - per a unilateral decision by a Third Mate, non-party Courtney Salatto.

80.    Salatto allowed a non-screened individual, non-party Erik Bekkelund, to board the Dependable. Bekkelund was onboard the vessel in tight passageways during this time, exposing the vessel to health risks.

81.    Quinn reported Salatto's infraction to non-party SCOTT WINFIELD, Director of Fleet Operations for SubCom, at the time of her own disciplinary warning.

82.    Salatto received no discipline for this incident, even though it was identical to the conduct SubCom used to justify suspending Quinn. Winfield merely stated he would notify the dock gate to prevent a repeat.

83.    Captain Durieux's written statement to SubCom confirmed as such, stating that he was not aware of any discipline ever occurring in the past as a result of similar instances.

84.    In Captain Durieux's written statement to SubCom he opined that no ethics violation had taken place, no one was injured, and the rescue boats were used in their normal routine practice.

85.    Despite Durieux's written admission of responsibility and acknowledgment that such family access was routine, SubCom suspended only Quinn. Durieux received no comparable discipline.

86.    Captain Quinn was suspended without pay for approximately six (6) months, from July until January 5, 2021.

87.    When Quinn returned to work, on January 5, 2021, for another six (6) month onboard rotation, she was assigned to work on the Endeavour vessel.

88.    When Quinn returned to work onboard, she was careful not to divulge any aspect of the confidential Disciplinary Agreement to her peers or to the AMO Union, as was agreed between her and SubCom.

89.     Quinn was very briefly demoted upon her return, from First Officer to Second Mate, but this lasted for only (2) months out of her next six (6) month rotation.

90.     Captain Durieux was not demoted or suspended despite accepting responsibility for authorizing the event. He returned to the Dependable for his normal rotation with only a temporary reduction in pay.

## VI.   Captain Quinn Returns to Work Onboard SubCom Vessels, Receiving Further Promotions.

91.     Captain Quinn served on the Endeavour as First Officer until May 30, 2022, completing at least three (3) lengthy onboard rotations, equivalent to ten (10) months at sea.

92.     On July 5, 2022, Captain Quinn was informed by the Senior Manager of Crewing, non-party LINDA LAVENDER ("Lavender"), that Quinn was being transferred to the Resolute vessel, due to the needs of the business.

93.     Quinn had not received any further disciplinary warnings since the rescue boat ride two (2) years prior, and never received any after being transferred to the Resolute.

94.     Captain Quinn served on the Resolute for almost another year, from July 25, 2022 through May 17, 2023.

95.     She was promoted once again, this time advancing from First Officer to Chief Mate during her rotation onboard the Resolute ship, in October of 2022.

96.     Captain Henry Charles Grill was in a supervisory role (of either Chief Mate or Master) over Quinn, from approximately September 2022 through May 2023, while Captain Quinn served two (2) rotations onboard the Resolute.

## VII.   Quinn is Separated from SubCom, and Seeks Other Employment.

97.     SubCom released Captain Quinn from her employment on or about May 17, 2023.

98.     She was not terminated for any wrongdoing; the separation was due to an apparent reduced need for ship members.

99.     Quinn began working with the AMO Union in May 2023 to secure the severance payment owed to her. SubCom was aware of these efforts and made additional demands during the severance discussions. This ongoing dispute gave SubCom a motive to undermine Quinn's credibility within the Union, the same organization that later received SubCom's false statements.

100.    In or before December 2023, Captain Quinn applied for other employment, including a role as a "Marine Accident Investigator" with the National Transportation and Safety Board ("NTSB").

101.    As a result of her application with the NTSB and other government agencies, the Defense Counterintelligence and Security Agency (DCSA) performed a routine background investigation on Captain Quinn.

**VIII.   The DCSA Routine Investigation of Quinn Spurs SubCom's Defamatory and Disparaging Statements.**

102.    The DCSA is the federal government's largest security agency, responsible for vetting the U.S. government workforce by performing background investigations on new and existing personnel. The DCSA provides background check information to 140 federal agencies and more than 10,000 cleared employer companies in the private sector.

103.    The DCSA sent two (2) identical background check forms to SubCom seeking employment information regarding Captain Quinn; the "Investigative Request for Employment Data and Supervisor Information" (the "DCSA Forms").

104.    The DCSA Forms stated that their purpose was, in part, to assess national security clearances for access to classified information, more thoroughly stated as follows:

**PRIMARY PURPOSE**: To obtain background information and personal records for investigating and determining an individual's initial or continued: **eligibility for access to classified national security information** or **assignment to positions with sensitive duties, suitability for enlistment** or appointment into military service, **suitability for federal employment, fitness for assignment to work under contract for or on behalf of the government**, or eligibility for physical or logical access to U.S. Government systems or facilities.

**DCSA Forms, referenced hereto as Composite Exhibit B.** are being attached separately and filed under seal.

105.     The DCSA forms requested feedback on Captain Quinn's honesty, trustworthiness, eligibility for rehire with SubCom, and SubCom's recommendation for Quinn's employment with the U.S. Government and/or her security clearance(s). **DCSA Forms, Exhibit B.**

106.     One of the two (2) identical DCSA Forms was specifically addressed to Captain Henry Charles Grill, while the other was addressed generically to the SubCom "Personnel Office." **Exhibit B.**

107.     Quinn specifically identified Captain Grill as an employment reference when asked for such a reference by the DCSA.

108.     The DCSA Form confirms that Quinn was the person to identify Henry Grill as the addressee to whom the DCSA Form was sent, stating as follows:

**INSTRUCTIONS**: Your **contact information was provided by the person identified below** to assist in completing a background investigation to help us determine this person's eligibility for employment or security clearance. To help us make this determination, we ask that you complete all items on the back of this form and return the form in the enclosed envelope.

109.    Despite one DCSA Form being addressed directly to Captain Grill, SubCom instead directed its Senior Manager of Crewing Linda Lavender to complete both DCSA Forms, on December 1, 2023.

110.    Lavender completed the forms on behalf of and at the direction of SubCom, and she further referenced Scott Winfield, SubCom's Director of Fleet Operations and Labor, within the DCSA Forms.

111.    SubCom responded to the DCSA inquiry by making multiple knowingly false and defamatory statements about Quinn.

112.    SubCom made these statements while it was actively engaged in months of severance negotiations with Quinn and the AMO Union. SubCom knew these statements would undermine Quinn's standing with the Union and damage her professionally, and it submitted them for that purpose. The statements were maliciously intended to harm Quinn professionally.

113.    Defendant SubCom submitted two (2) knowingly false and defamatory DCSA Forms to the Defense Counterintelligence and Security Agency (DCSA); these were official government investigative forms, used for security clearance and hiring investigations for the entire U.S. government.

114.    In these reports, SubCom falsely claimed that Captain Henry Grill was not Captain Quinn's supervisor, and further reported that Captain Quinn was lying to both the DCSA and NTSB when she identified Henry Grill as one of her prior supervisors.

115.    SubCom reported that Lavender and Scott Winfield were Captain Quinn's supervisors, and that it was a "false statement" and a "false claim" by Quinn that Henry Grill was ever her supervisor.

116.     The statement is written as a fact, and it is absolutely false. Captain Grill supervised Quinn aboard the Resolute as Chief Mate or Master from approximately September 2022 through May 2023, and he exercised direct operational authority over her during at least two consecutive rotations onboard the Resolute.

117.     SubCom also falsely accused Quinn of intentionally falsifying her supervisor's identity to the DCSA, an allegation that carries severe professional and security-clearance consequences.

118.     The DCSA investigative Standard Form 86 specifically states that:

> Withholding, misrepresenting, or falsifying information may affect your eligibility for access to classified information, eligibility for a sensitive position, or your ability to obtain or retain Federal or contract employment.
>
> In addition, withholding, misrepresenting, or falsifying information may affect your eligibility for physical and logical access to federally controlled facilities or information systems.
>
> Withholding, misrepresenting, or falsifying information may also negatively affect your employment prospects and job status, and the potential consequences include, but are not limited to, removal, debarment from Federal service, loss of eligibility for access to classified information, or prosecution.

119.     The DCSA Form does not state that Quinn identified Captain Grill as her only supervisor. One of the Forms was addressed generically to SubCom's Personnel Office, enabling SubCom to provide any other supervisory information it believed relevant. **Exhibit B, DCSA Forms.**

120.     SubCom knew at the time it completed the DCSA forms that Captain Henry Grill had supervised Quinn for two (2) consecutive rotations aboard the Resolute.

121.   SubCom's own personnel records reflected this chain of command, and SubCom approved those assignments. SubCom knew its statement that Quinn "falsely claimed" Grill was her supervisor was untrue.

122.   SubCom's knowingly false statements continued, within the DCSA Forms, wherein SubCom falsely and maliciously stated that Captain Quinn "has questionable ethics and can be misleading." **Exhibit B, DCSA Forms.**

123.   And when the DCSA Forms asked, "Do you have any reason to question this person's honesty or trustworthiness?" – Defendant expressly replied YES on one (1) of the forms.

124.   These statements were knowingly false – they are contradicted SubCom's own conduct toward Quinn and the absence of any disciplinary record.

125.   SubCom itself repeatedly promoted Quinn after the only disciplinary incident of her career.

126.   She was promoted multiple times, including immediately after the rescue boat ride event, in July 2020, to First Officer.

127.   SubCom later entrusted Quinn to apply for and obtain a higher level security clearance in July 2020, only two months after the rescue boat event, so that SubCom could service a sensitive and confidential government client. SubCom possessed no records or complaints of Captain Quinn indicating dishonesty, misleading conduct, or ethical violations. To the contrary, Quinn was consistently assigned to safety critical responsibilities, including navigation, vessel administration, and cable operations, as well as technical and hazardous nighttime deep sea cable installation missions.

128.   With the exception of the 2020 rescue-boat incident, where the vessel's captain, Captain Durieux, accepted full responsibility, Quinn never received any other disciplinary action.

129.    No document in Quinn's employment file reflects dishonesty, ethical violations, or misleading conduct. Her six-year tenure included uninterrupted security-clearance eligibility, which SubCom relied upon when assigning her to missions involving classified or sensitive work.

130.    By asserting that Quinn had "questionable ethics" despite the absence of any internal documentation supporting such a conclusion, SubCom knowingly made false statements contrary to its own employment records.

131.    SubCom maliciously selected these particular statements knowing they would directly impact Quinn's national-security clearance and her future career in the maritime and government sector for the long term.

132.    These allegations strike at the core of Quinn's eligibility to hold a national-security clearance. SubCom knew why DCSA was requesting information about Quinn's honesty, and its response was intentional, malicious, and knowingly false.

133.    SubCom knew the DCSA forms determine eligibility for national-security clearance, federal employment, and government-contract work. SubCom understood that an accusation of dishonesty, falsification, or unethical conduct could irreparably damage Quinn's career. Despite that knowledge, SubCom made statements it knew to be false.

134.    With respect to rehire eligibility, SubCom falsely wrote that it "would not rehire [Quinn] as she did some very questionable things." **Exhibit B, DCSA Forms.** That accusation is false. SubCom disciplined Quinn only once, three years earlier, for an event the vessel captain admitted was his responsibility. SubCom repeatedly promoted her after that event.

135.    In writing, Captain Durieux accepted full responsibility for the 2020 rescue-boat event, confirmed that safety protocols were followed, and acknowledged that he had permitted similar activities for male officers in prior years and would do so again.

136.    Quinn was not found to have violated any ethics policy, and SubCom returned her to duty, assigning her to additional vessels, and continued to promote her for three (3) years after the event. SubCom never cited any other conduct that could qualify as "questionable."

137.    SubCom also falsely stated that Quinn is not eligible for rehire due to "reasons relating to unfavorable employment," and that her "General Behavior or Conduct" constituted "adverse information about [her] employment."

138.    The accusations that Quinn had "unfavorable employment," or that her "General Behavior" was adverse, are also knowingly false because Quinn's employment record reflects multiple promotions, long-term assignments to critical operational roles, elevation in security clearance level for the purpose of allowing SubCom to serve sensitive and confidential government clientele, and positive performance evaluations over six years.

139.    SubCom never issued any negative performance reviews, never documented misconduct other than the rescue-boat incident (for which Quinn was not deemed responsible), and continued to promote and reassign Quinn across four vessels. These facts contradict the assertion that her employment was "unfavorable" or that SubCom took issue with her "General Behavior or Conduct."

140.    Egregiously, SubCom refused to recommend Quinn for security clearance, on both DCSA Forms.

141.    This statement is knowingly false and highly damaging, especially because Quinn held her clearance before joining SubCom, and SubCom relied on her clearance throughout her six-year tenure.

142.    Quinn's security clearance was a main reason SubCom hired her from the U.S. Marine Academy.

143.    The DCSA Forms completed by SubCom contain multiple knowingly false statements that directly undermine Quinn's qualifications to hold a national-security clearance. SubCom submitted these forms with malicious intent to damage Quinn's professional reputation.

144.    SubCom had no justification for its false statements, and made them only after Quinn sought her severance and accrued vacation time payment and after SubCom learned she was pursuing federal employment through the DCSA process. SubCom also knew that its defamatory statements would reach the AMO Union in Florida, where they would cause immediate professional harm.

145.    The falsity of SubCom's statements is demonstrated by Captain Durieux's written admission accepting full responsibility for the only disciplinary event in Quinn's six-year career.

146.    SubCom's continued re-employment and repeated promotion of Quinn for three years after the rescue-boat event confirms that she was not a problem employee and was not terminated for misconduct.

147.    On one of the DCSA Forms, SubCom falsely alleges "Quinn was let go from [the] company."

148.    SubCom also refused to admit on a separate DCSA Form that Quinn had been "separated," rather than terminated for wrongdoing, despite that distinction being material under the  DCSA Form's criteria. **Exhibit B, DCSA Forms.**

149.    The statements are written as facts, and are absolutely false.

150.    SubCom knew the truth when it reported these statements.

151.    SubCom acted with actual malice in its decision to report such defamatory statements. SubCom knew its statements about Quinn were false because its own personnel records reflected that Captain Henry Grill supervised Quinn aboard the Resolute for two rotations.

152.    SubCom also knew that Quinn had never been disciplined for dishonesty, unethical conduct, or misleading behavior, and that SubCom repeatedly promoted her into positions of increasing responsibility based on her performance.

153.    By reporting that Quinn "falsely claimed" a supervisor, had "questionable ethics," engaged in "questionable things," and was unfit for security clearance, SubCom knowingly contradicted facts within its own exclusive possession.

154.    SubCom further omitted facts that undermined its accusations, including Durieux's written acceptance of responsibility, Quinn's multiple promotions, and her unbroken clearance history including obtaining additional elevated security clearances for the benefit of SubCom.

155.    SubCom made these statements despite knowing the DCSA forms would directly impact Quinn's national-security eligibility and federal hiring prospects. Its refusal to correct or amend the false statements confirms its malicious intent to harm Quinn's reputation.

156.    SubCom intentionally withheld facts necessary to present the false impression it conveyed.

157.    SubCom failed to disclose in the DCSA Forms that Quinn had been promoted multiple times, had never been found dishonest, had no adverse employment history beyond a single event for which another officer accepted responsibility, and was separated solely due to reduced staffing needs. SubCom's omission of these facts was deliberate and done for the purpose of misleading DCSA investigators into believing Quinn had engaged in undisclosed misconduct.

## IX.    <u>Plaintiff First Learns of the Defamatory Statements at the Enhanced Subject Interview</u>.

158.    Quinn was unaware of the existence of the DCSA Forms until February of 2024, when Quinn was contacted by the DCSA, on February 8, 2024, for the purpose of scheduling an Enhanced Subject Interview (ESI) at her current place of employment at the NTSB.

159.    The ESI is triggered when the DCSA receives negative investigative information about government personnel, such as the defamatory DCSA Forms submitted by SubCom.

160.    SubCom's false statements were the sole reason the ESI was triggered. Without SubCom's defamatory submission, Quinn's background investigation would not have been flagged and her federal employment would have proceeded without interruption.

161.    Quinn was not told the reason for the meeting prior to its occurrence. She had never previously experienced an ESI, and assumed it was a routine because of her extensive foreign travel.

162.    The ESI occurred on February 14, 2024, when a DCSA investigator named Yvonne Creswell informed Quinn of the defamatory statements in the DCSA Forms.

163.    Creswell read out loud to Quinn the quotes that SubCom had made about her in the DCSA Forms. Ms. Creswell  did not show or provide to Quinn the physical forms, however.

164.    Ms. Creswell told Captain Quinn that the DCSA Forms are problematic for Quinn in required future background checks for government employment and/or security clearance for employment with private companies contracting defense work with the U.S. Government.

165.    Quinn explained that she had been unable to confront SubCom earlier because she believed the Disciplinary Warning, labeled by SubCom as an NDA, remained confidential.

166.    Captain Quinn made a FOIA request for the documents, and received the actual investigative forms from the DCSA in April of 2024, containing the aforementioned defamatory statements.

167.    Quinn then learned that SubCom had violated the confidentiality provision in the Disciplinary Warning, and that the DCSA Forms would remain permanently accessible within federal vetting databases, causing long-term professional harm.

168.    The DCSA maintains a historical record of all background investigation records it collects, within the "Personnel Vetting Records System," DUSDI 02-DoD.

169.    The false and defamatory DCSA Forms are widely available to DCSA personnel, who are responsible for collecting and/or analyzing the investigative forms.

170.    The DCSA Forms and/or the information contained therein are also widely available to various government agencies and cleared corporations that perform government contract work, which entities depend on the DCSA investigations to make hiring decisions by using the information collected as follows.

171.    The DCSA Form expressly states that the information may be shared with other government agencies and private employers involved in personnel vetting, making SubCom's statements available to a broad network of authorized recipients.

> **ROUTINE USES:** The information collected **may be disclosed to DCSA personnel and <u>shared externally with other authorized government agency personnel as a routine use when necessary and relevant to personnel vetting investigations</u>**, determinations, and adjudications; and, for other purposes permitted under subsection (b) of the Privacy Act of 1974, as amended (5 USC §552a). Information obtained will also be released to the person being investigated upon their request unless otherwise exempt. A complete list of the routine uses can be found in the system of records notice for the Department of Defense Personnel Vetting Records System, "DUSDI 02-DoD."  (emphasis added).

172.    The Systems of Record Notice (SORN), published by the Office of the Secretary of Defense on October 17, 2018, elaborates further on the various uses of the DCSA investigator reports and forms, and their reach in terms of both how long historical data is kept by the DCSA, as well as who can access those records.

173.   The DCSA Forms are used for continuous vetting. As a result, SubCom's statements will remain active in Quinn's personnel-vetting profile and will be repeatedly accessed throughout her career.

[The] "Personnel Vetting Records System" . . . supports the Department of Defense (DoD) in conducting end-to-end personnel security, fitness, suitability, and **credentialing processes**, including application and questionnaire submission, investigations, adjudications, **and continuous vetting activities**. The Personnel Vetting Records System integrates DoD information technology capabilities developed to support the execution of **federal background investigation activities**, including: Investigations and **determinations of eligibility for access to classified national security information**, eligibility to occupy a sensitive position, and for access to special access programs; **suitability for federal employment**; fitness of contractor personnel to perform work for or on behalf of the U.S. Government, and Homeland Security Presidential Directive (HSPD)-12 determinations for Personal Identity Verification (PIV) credentials to gain logical or physical access to government facilities and systems.

The Personnel Vetting Records System also supports: submissions of adverse personnel information; verification of investigation and adjudicative history and status; support of continuous evaluation (CE); and insider threat detection, prevention, and mitigation activities. The system may also be used as a management tool for statistical analyses; tracking, reporting, and evaluating program effectiveness; and conducting research related to personnel vetting.

174.   These DCSA Forms will have long term consequences for Quinn's maritime, federal, and naval career.

175.   The forms submitted to DCSA by SubCom cannot be fully withdrawn, but SubCom may submit an amendment to the records, under the authority of 32 C.F.R. § 310.7, as follows:

A party requesting an amendment shall follow the procedure ("identify each particular record in question, state the amendment or correction that is sought, and state why the record is not accurate,

relevant, timely, or complete without the correction," and submit together therewith any "factual documentation" relevant to or supporting the proposed amendment.  32 C.F.R. § 310.7.)

176.   The amendment process is not guaranteed. A request for an amendment may be denied or granted, "in whole, or in part." *Id.* There is an appeals process if any part of a request is denied. *Id.*

177.   SubCom has refused to submit any amendment or correction to the DCSA Forms, despite knowing the process exists. This refusal demonstrates SubCom's deliberate decision to maintain a false and damaging narrative.

178.   In sum, SubCom's false accusations were made knowingly.

179.   SubCom was well aware that Captain Quinn's right to hold a national security clearance is paramount to her career in the naval and merchant maritime fields, as well as in any federal positions and employment with private cleared government contractors.

180.   SubCom intended its DCSA submissions to negatively impact Quinn's national-security eligibility and long-term career prospects.

181.   The false statements made to the DCSA damaged and will continue to damage Plaintiff's reputation.

182.   Quinn is now unable to apply for positions requiring advanced security clearances, including Florida-based maritime roles and federal contractor positions, such as roles with DoD-related employers, and private defense contractors in Florida.

183.   The DCSA records are shared with over 100 federal agencies and over 10,000 cleared government contractors who require security-clearance eligibility for hiring. As a result, Plaintiff has been discouraged or prevented from submitting or completing applications for

positions requiring an active national-security clearance, including roles comparable to the NTSB position.

184.    The loss of these opportunities constitutes additional special damages, the amount of which will be proven through payroll records, comparative salary data, and hiring-process documentation obtained in discovery.

185.    The AMO Union received the DCSA Forms, and Quinn's reputation was damaged within the Union. This has impaired her ability to obtain the professional benefits of membership, including career assistance, training, and arbitration support. The Union's failure to pursue her severance claim reflects this impact.

186.    It is evident that SubCom's Director of Fleet Operations, Scott Winfield, who sits on the AMO Union Board of Directors, reinforced these defamatory statements within the Union, contributing to the Union's refusal to assist Quinn.

187.    Prior to the release of the DCSA Forms, the AMO Union managed Quinn's professional development, for example, they have personnel that can assist union members with obtaining new credentials or employment. The Union was in the practice of both locating jobs for its members, as well as recommending them for employment.

188.    The AMO Union collects and records background information on its members, including credentials, previous ships, letters of recommendation, union standing, and importantly, security clearance level.

189.    The DCSA Forms will now appear in Quinn's Union record and will influence the Union's assessment of her candidacy for employment and security clearance eligibility.

190.     The AMO Union is frequently also contacted by the DCSA to complete background investigations for its members, and the Union shares information about members with potential and current employers upon request.

191.     After the receipt of the DCSA Forms, the AMO Union failed to assist Bridget in the ways it is required to.

192.     For example, it has been over two and a half years (2.5) and the AMO still has not obtained Quinn's severance payment, nor have they initiated arbitration to obtain her severance. Quinn was forced to hire her outside counsel at her own cost.

193.     The Union's refusal to perform these required functions is directly tied to SubCom's defamatory statements about Quinn.

194.     SubCom's defamatory statements effectively prevented Quinn from obtaining the Union's assistance in pursuing her severance and other rights.

195.     The defamatory statements have also deterred Quinn from attending training at the Union's Florida headquarters due to the reputational harm caused by SubCom.

196.     Captain Quinn recently attended a training at a different school in Florida, not the AMO Union.

197.     Quinn's professional development depends on maintaining a strong relationship with the AMO Union, and SubCom's defamatory statements have significantly damaged that relationship.

198.     Plaintiff will quantify and prove these actual damages at trial.

199.     The magnitude of harm caused by SubCom's conduct is such that Plaintiffs also intend to seek punitive damages once permitted by the Court, given the willful and malicious nature of SubCom's defamation.

## COUNT I – DEFAMATION PER SE

200.    Plaintiff, Bridget Quinn, re-alleges and incorporates the allegations in paragraphs 1 through 198  as if fully set forth herein.

201.    SubCom made and published knowingly false factual statements "of and concerning" Captain Quinn.

202.    In the DCSA Forms, SubCom explicitly wrote that Quinn had "falsely claimed" and had "falsely stated" that Captain Henry Grill was Quinn's supervisor.

203.    The above statement is false. Quinn did not falsely identify Henry Grill as her supervisor.  Captain Henry Charles Grill was in a supervisory role (of either Chief Mate or Master) over Quinn, from approximately September 2022 through May 2023, while Captain Quinn served two (2) rotations onboard the Resolute.

204.    SubCom instead identified Linda Lavender and Scott Winfield as Quinn's only supervisors, but these individuals worked in the main personnel offices of SubCom, not onboard the Resolute itself observing Quinn's actual performance on the high seas in her various roles.

205.    SubCom's accusation that Quinn misrepresented her supervisor was not only knowingly false but accused her of intentional falsification, conduct that carries severe security-clearance consequences.

206.    The DCSA investigative Standard Form 86 specifically states that:

> Withholding, misrepresenting, or falsifying information may affect your eligibility for access to classified information, eligibility for a sensitive position, or your ability to obtain or retain Federal or contract employment.
>
> In addition, withholding, misrepresenting, or falsifying information may affect your eligibility for physical and logical access to federally controlled facilities or information systems.

31

Withholding, misrepresenting, or falsifying information may also negatively affect your employment prospects and job status, and the potential consequences include, but are not limited to, removal, debarment from Federal service, loss of eligibility for access to classified information, or prosecution.

207.    The DCSA Form does not state that Quinn identified Captain Grill as her <u>only</u> supervisor. One of the DCSA Forms was addressed to SubCom's Personnel Office, enabling SubCom to provide any other supervisory information it believed relevant. **Exhibit B, DCSA Forms.**

208.    Any implication by SubCom that Quinn lied when she identified her supervisor is knowingly false.

209.    SubCom's false statements continued within the DCSA Forms, wherein SubCom falsely stated that Captain Quinn "has questionable ethics and can be misleading." **Exhibit B, DCSA Forms.**

210.    And when the DCSA Forms asked, "Do you have any reason to question this person's honesty or trustworthiness?" – Defendant expressly replied YES.

211.    On one form, SubCom states that Quinn is not eligible for rehire due to "company policy" as well as "reasons relating to unfavorable employment."

212.    And on the other form, SubCom wrote that SubCom "would not rehire [Quinn] as she did some very questionable things." **Exhibit B, DCSA Forms.**

213.    On one form, SubCom falsely reported that Quinn's "General Behavior or Conduct" constituted "adverse information about [her] employment."

214.    Egregiously, SubCom refused to recommend Quinn for security clearance, on both DCSA Forms.

215.    This statement about Quinn's security clearance is false and defamatory because she already held a national security clearance before joining SubCom, and SubCom relied on that clearance throughout her six year tenure, including requesting and having Quinn obtain a higher level national security clearance in July 2020 during her employment.

216.    Quinn's national security clearance was a main reason SubCom hired her from the U.S. Marine Academy.

217.    SubCom's choice to knowingly mischaracterize Quinn as dishonest, misleading, and having questionable ethics goes to the heart of Quinn's ability to hold a national security clearance. SubCom knew precisely why they were being asked about Quinn's honesty.

218.    The statements reported by SubCom are defamatory per se.

219.    The false accusation that Quinn is dishonest and misleading, with questionable ethics, naturally tends to subject her to hatred, distrust, ridicule, contempt, or disgrace.

220.    The statements also injure her reputation in her trade or profession, as it imputes conduct that injures or is incompatible with her roles as a government employee, naval officer and deep sea mariner.

221.    The statements are also clearly incompatible with Quinn's essential ability to hold a national security clearance, going directly to the skills required for such clearance. No further explanation is needed to demonstrate the defamatory nature of such a charge.

222.    A person reading these statements could reasonably understand them to implicate Quinn's moral character and professional ethics.

223.    SubCom's defamatory statements also harmed Quinn in a manner that can be presumed at common law because of its egregious character.

224.    SubCom published the false statements about Quinn with actual malice, that is, with actual knowledge of its falsity.

225.    SubCom knew that the accusations were false, and reported it anyway to harm Quinn's future employment efforts, and harm her ability to receive her severance or utilize any of the AMO Union's other member benefits.

226.    Proof of general or special damages is unnecessary where the words are actionable per se. Per se defamatory statements, including these by SubCom, are so obviously defamatory and damaging to one's reputation that they give rise to an absolute presumption both of malice and damage.

227.    As a direct and proximate result of SubCom's intentional actions, Quinn suffered serious personal and professional consequences, including humiliation, reputational harm, mental anguish, and loss of business opportunities.

228.    As a direct and proximate result of SubCom's misconduct, Quinn is entitled to compensatory, special, and punitive damages.

WHEREFORE, Plaintiff, Bridget Quinn, demands judgment against SubCom for compensatory, special, and punitive damages in amounts to be determined at trial, together with interest, taxable costs, and a trial by jury on all issues so triable. Plaintiff also requests such further relief as the Court deems just and appropriate.

## COUNT II – DEFAMATION BY IMPLICATION

229.    Plaintiff, Bridget Quinn, re-alleges and incorporates the allegations in paragraphs 1 through 198 as if fully set forth herein.

230.    SubCom's reporting on the DCSA Forms, concerning Quinn, conveyed a strong defamatory implication about Quinn that goes beyond the explicit statements made therein.

231.    On one form, SubCom falsely and maliciously wrote that SubCom "would not rehire [Quinn] as she did some very questionable things." **Exhibit B, DCSA Forms.**

232.    On one form, SubCom also reported that Quinn's "General Behavior or Conduct" constituted "adverse information about [her] employment."

233.    SubCom also falsely stated that Captain Quinn "has questionable ethics and can be misleading." **Exhibit B, DCSA Forms.**

234.    A reader of these statements, without knowing Quinn's actual record, would conclude that she is unfit to hold a national-security clearance or government employment. That implication is false and defamatory.

235.    This language can only be reasonably read to impart a false innuendo, and to imply undisclosed defamatory facts.

236.    Given the nature and context of the DCSA Forms, and the totality of SubCom's maliciously false statements, SubCom intended or affirmatively endorsed the false and defamatory inferences conveyed about Quinn.

237.    SubCom was and continues to be well aware that their wording can create defamatory implications. Here, SubCom intended to convey this implication.

238.    SubCom knew that the phrase "she did some very questionable things" would lead readers to infer undisclosed misconduct yet included it anyway.

239.    SubCom's statements were deliberately inviting readers to assume serious undisclosed wrongdoing by Quinn.

240.    Indeed, SubCom omitted or downplayed crucial facts that would have dispelled any notion of wrongdoing by Quinn.

241.    SubCom omitted critical facts that would have dispelled any inference of misconduct, including that Quinn had been repeatedly promoted, that Captain Durieux accepted full responsibility for the rescue-boat event, that Quinn had no other discipline in six years, and that other officers had permitted similar family access without consequence.

242.    As a direct result of SubCom's defamatory implication, Quinn suffered actual injuries, including but not limited to an investigative ESI interview with the DCSA, injury to her professional reputation, damaged reputation within the AMO Union, lost business income and opportunities, emotional distress (such as embarrassment, humiliation, and anguish at being labeled dishonest and misleading, qualities which are in direct juxtaposition to her lauded career in which she holds a security clearance), and other pecuniary and non-pecuniary losses, as well as reputational harm, emotional distress, and loss of income, business goodwill and other pecuniary and non-pecuniary losses.

243.    SubCom is liable for defamation by implication because the DCSA Forms, taken as a whole, would reasonably cause readers to draw a false and defamatory conclusion about Captain Quinn.

244.    SubCom acted with actual malice in publishing these false implications, as detailed previously.

245.    SubCom knew these implications were false. SubCom relied on Quinn's clearance for six years, yet allowed statements implying she lacked honesty or clearance suitability to be communicated to the DCSA.

246.    As a direct and proximate result of SubCom's misconduct, Quinn is entitled to compensatory, special, and punitive damages.

WHEREFORE, Plaintiff, Bridget Quinn, demands judgment against SubCom for compensatory, special, and punitive damages in amounts to be determined at trial, together with interest, taxable costs, and a trial by jury on all issues so triable. Plaintiff also requests such further relief as the Court deems just and appropriate.

## COUNT III – TRADE LIBEL

247.     Plaintiff, Bridget Quinn, re-alleges and incorporates the allegations in paragraphs 1 through 198 as if fully set forth herein.

248.     SubCom published false statements in the DCSA Forms that it knew or should have known would likely result in inducing others not to do business with Quinn.

249.     The falsehoods published by SubCom played and will continue to play a material and substantial part in inducing government and private entities not to employ Quinn, or to prevent her from obtaining employment roles that require national security clearance.

250.     SubCom's false statements were of and concerning Quinn's business, services, and professional offerings.

251.     The defamatory statements targeted Quinn's professional qualifications, including her eligibility to hold a security clearance and occupy positions requiring trust and honesty. SubCom directly disparaged the legitimacy of her professional career.

252.     Quinn suffered special damages as the direct and proximate result of SubCom's published falsehoods.

253.     Quinn has been prevented from seeking or advancing in employment requiring a security clearance because the DCSA Forms are automatically disseminated to federal agencies and private contractors that rely on DCSA vetting.

254.    The exact amount of such damages will be proven at trial.

255.    SubCom published these false statements intentionally, deliberately, and with actual malice, showing willful indifference to Quinn's profession and reputation.

256.    As a direct and proximate result of SubCom's false statements, Quinn suffered identifiable economic loss. In December 2023, she applied for a compensated federal position as a Marine Accident Investigator with the National Transportation Safety Board. That hiring process required a DCSA background investigation. On February 14, 2024, during an Enhanced Subject Interview (ESI), a DCSA investigator informed Quinn that SubCom's statements were "problematic" for her adjudication and were the reason the ESI had been triggered.

257.    The DCSA investigator further explained that SubCom's allegations created concerns regarding Quinn's higher-level national security clearance.

258.    Because the same false DCSA entries are shared with federal agencies and contractors requiring clearance eligibility, Quinn has been unable to pursue comparable positions, including clearance-required maritime, defense, and aerospace roles for which she is qualified. These include Florida-based commercial shipping roles and DoD-related contractor positions that require maintenance of the national security clearance she held without issue for nearly a decade, including opportunities in Florida-based maritime roles and federal contractor positions, such as opportunities with defense-related employers operating in Central Florida.

259.    Quinn's exclusion from these opportunities constitutes special damages directly caused by SubCom's false statements. These losses are quantifiable through federal pay tables and compensation structures for clearance-dependent maritime and defense roles. Quinn will establish these damages through hiring-process documentation, DCSA adjudicative timelines, and standard contractor-compensation data obtained in discovery.

260.    As a direct and proximate result of SubCom's misconduct, Quinn is entitled to compensatory, special, and punitive damages.

WHEREFORE, Plaintiff, Bridget Quinn, demands judgment against SubCom for compensatory, special, and punitive damages in amounts to be determined at trial, together with interest, taxable costs, and a trial by jury on all issues so triable. Plaintiff also requests such further relief as the Court deems just and appropriate.

### COUNT IV – BREACH OF CONTRACT

261.    Plaintiff, Bridget Quinn, re-alleges and incorporates the allegations in paragraphs 1 through 198 as if fully set forth herein.

262.    The August 2020 Disciplinary Warning constitutes a valid and enforceable confidentiality agreement (the "Agreement") drafted by SubCom, and executed by and between SubCom and Captain Quinn.

263.    The document expressly states that the disciplinary matter would remain confidential, and SubCom referred to the agreement as an NDA.

264.    Plaintiff signed the Disciplinary Warning under pressure from SubCom's Director of Fleet Operations, Scott Winfield, who stated "we just need to sign this and we'll all be better for it."

265.    The consideration for the penalty contained within the Agreement was clearly communicated to Quinn as the confidential treatment of the disciplinary event, such that it would not be spoken about nor affect her career further.

266.    SubCom required Quinn to accept suspension without pay for six (6) months, in exchange for their keeping the matter confidential.

267.    SubCom thereafter materially breached the Agreement by disclosing the essence of the disciplinary event to the DCSA.

268.    SubCom nevertheless submitted negative investigatory information to the DCSA that was required to remain confidential.

269.    This disclosure directly violated SubCom's contractual promise that the disciplinary matter would remain a "confidential matter" as it is explicitly defined in the Agreement. **Exhibit A, Disciplinary Warning.**

270.    The breach was knowing and intentional. SubCom was fully aware of the confidentiality requirement, having drafted the Agreement itself, and repeatedly emphasizing its confidential nature to Captain Quinn.

271.    When Quinn learned of the disclosure and the availability of an amendment process for the DCSA Forms, SubCom also refused to submit any amendment, further demonstrating its intentional breach and decision to maintain the false information.

272.    The breach caused significant and ongoing damages to Plaintiff.

273.    The false and defamatory DCSA forms are widely available to DCSA personnel, over 100 government agencies and over 10,000 cleared companies that rely on the DCSA investigative information for hiring decisions.

274.    The DCSA permanently maintains these records in the Personnel Vetting Records System, meaning SubCom's disclosure not only violated the confidentiality provision of the Agreement, but it will have long-term consequences for Quinn's maritime and naval career and her ability to maintain a national security clearance.

275.     Specifically, Quinn suffered reputational damage within the AMO Union in Florida, affecting her ability to utilize union benefits including career placement, training opportunities, and litigation support.

276.     Florida public policy strongly supports enforcement of reasonable confidentiality agreements, and the public has a cognizable interest in protecting said contractual rights.

277.     The violation by SubCom of the restrictive covenant of confidentiality creates a presumption of irreparable injury to Captain Quinn.

278.     SubCom's breach of the August 2020 confidential Agreement continues to cause Quinn harm in breach of the Agreement.

279.     As a direct and proximate result of SubCom's breach of the confidentiality Agreement, Quinn has suffered damages.

WHEREFORE, Plaintiff respectfully requests that this Court (1) find that SubCom materially breached the confidentiality Agreement; (2) award Plaintiff compensatory and consequential damages resulting from the breach; (3) award interest, taxable costs, and a trial by jury on all issues so triable; and (4) grant such further relief as the Court deems just and appropriate.

Respectfully Submitted, on this 30th day of November, 2025

**Pike & Lustig, LLP**
***/s/ Rebecca L. Rhew, Esq.***
Daniel Lustig, Esq.
Florida Bar No.: 59225
Rebecca L. Rhew, Esq.
Florida Bar No.: 85134
1209 N. Olive Avenue
West Palm Beach, FL 33401
Telephone: (561) 855-7585
Facsimile: (561) 855-7710
pleadings@pikelustig.com
Attorneys for Plaintiff